UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Heather Swanberg, individually and on behalf of all others similarly situated, | 1:21-cv-06496 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Trader Joe's Company, | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Trader Joe's Company ("Defendant") manufactures, labels, markets, and sells "Honey Graham Crackers" under the Trader Joe's brand ("Product").



2. The relevant front label representations include "Honey Graham Crackers," with a

stylized "Honey," a honeybee buzzing across the label, "No Artificial Colors, Flavors, or Preservatives," and pictures of dark hued crackers.

## I. REPRESENTATIONS OF WHOLE GRAIN GRAHAM FLOUR

3. "Graham" is the biggest word on the front label followed by "Honey."

4. The Product's name and the dark-colored crackers cause consumers to expect that whole grain graham flour is the primary and predominant flour ingredient used.

5. Consumers associated darker hues in grain products with the presence of significant amounts of whole grains.

6. Dictionaries confirm what reasonable consumers expect when it comes to a "graham cracker," defining it as "a slightly sweet cracker made of whole wheat flour" and "a semisweet cracker, usually rectangular in shape, made chiefly of whole-wheat flour."[1]

7. This whole grain content distinguishes a graham cracker from other crackers made with mostly enriched flour, also referred to "white flour" or "refined flour."

8. White flour is called "enriched flour" because the processing removes all its nutrients, such that they are "added back" to the flour.

9. In whole grain flour, all three parts of the grain are used as opposed to enriched flour, which only uses the endosperm.

---

[1] https://www.dictionary.com/browse/graham-cracker

10. That the "Graham" in "Graham Crackers" admittedly refers to whole wheat grain flour is confirmed by the ingredient list in small print on the side of the Product.



**INGREDIENTS:** UNBLEACHED ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE, RIBOFLAVIN, FOLIC ACID), WHOLE WHEAT GRAHAM FLOUR, SUGAR, VEGETABLE OIL (SAFFLOWER AND/OR PALM FRUIT OIL), DRIED CANE SYRUP, HONEY, CALCIUM CARBONATE, SALT, BAKING POWDER (SODIUM BICARBONATE, AMMONIUM BICARBONATE, MONOCALCIUM PHOSPHATE), NATURAL FLAVOR, SOY LECITHIN (AN EMULSIFIER).

11. Reasonable consumers expect a food identified by the name of a whole grain flour will contain mainly whole grain flour, and more whole grain flour than if the food was merely labeled, "Crackers."

12. However, the ingredient list reveals "Enriched Flour" is the predominant flour, indicated by its listing ahead of "Whole Wheat Graham Flour."

**II. REASONS CONSUMERS VALUE WHOLE GRAINS**

13. Surveys have confirmed that consumers increasingly seek products made with whole grains because they contain more fiber than refined white flour.

14. Specifically, these findings indicate that:

- At least half of consumers expect that for every gram of whole grain per serving, there will be at least a gram of fiber;

- Two-thirds of consumers (67%) agree that whole grain foods are high in fiber;

- Consumers viewing darker colored grain products expect it to be a good source of fiber;

- Identifying a product with the name of a whole grain flour is equivalent to a representation that the product will predominantly be made with whole grains; and

- 75% of consumers who observe claims that a product is made with, or contains whole grain flour, will expect the food to be at least a good source of fiber.

15. The 2015 Dietary Guidelines for Americans recommended that at least half of the grains in a healthy diet should be whole grains.

16. The FDA cautioned manufacturers against misleading consumers as to whole grain content of foods:

> 7. Question: Does the term "whole grain" mean the same as "100 percent whole grain"? If a product is labeled as "whole wheat bagel" or "whole wheat pizza," how much whole wheat should it contain? What is graham flour?
>
> Answer: FDA has not defined any claims concerning the grain content of foods. However, the agency has established standards of identity for various types of cereal flours and related products in 21 CFR Part 137, including a standard of identity for "whole wheat flour" (§ 137.200) and "whole durum flour" (§ 137.225). Graham flour is an alternative name for whole wheat flour (§ 137.200).
>
> Depending on the context in which a "whole grain" statement appears on the label, it could be construed as meaning that the product is "100 percent whole grain." We recommend that products labeled with "100 percent whole grain" not contain grain ingredients other than those the agency considers to be whole grains.

17. The FDA has warned companies against making misleading whole grain

4

representations in a product name – "HiHo Deluxe WHOLE WHEAT Crackers" and "Krispy WHOLE WHEAT Saltine Crackers" – where the products were predominantly white flour.[2]

18.  The Federal Trade Commission ("FTC") recognized that "[M]any reasonable consumers will likely understand 'whole grain' [claims] to mean that all, or virtually all, of the food product is whole grain, or that all of the grain ingredients in the product are whole grains.[3]

19.  By highlighting the Product's whole grain ingredient, "GRAHAM," as part of the product name, larger than everything else on the label, Defendant is highlighting the presence of nutrients associated with whole grains – fiber.[4]

20.  Plaintiff and consumers expect a product represented with such "whole grain" claims to be a good source of fiber, defined providing at least 10 percent of what adults should consume each day.

21.  The amount of whole grain wheat flour in the Product is approximately twenty-five percent of the amount of refined flour.

22.  This is based on the Nutrition Facts, which reveals the Product is not a good source of fiber, as it indicates only one gram of fiber (c. 4%) per serving.

### III. THE SMALL AMOUNT OF HONEY DARKENS THE PRODUCT'S COLOR

23.  Consumers associate darker hues in grain products with a significant amount of whole grain ingredients.

24.  Though the Product contains honey purportedly for its sweetening effect, the honey is used to impart a darker color.

---

[2] CSPI Petition to Prohibit Misbranding of Whole Wheat Products and to Promulgate Food Labeling Regulations Concerning Products Made with Whole Wheat, Docket No. 93P-0227 (Jun. 25, 1993).
[3] In the Matter of Draft Guidance for Industry and FDA Staff: Whole Grains Label Statements, Docket No. 2006-0066 Comments of the Staff of the Bureau of Consumer Protection, the Bureau of Economics, and the Office of Policy Planning of the Federal Trade Commission April 18, 2006
[4] 21 U.S.C. § 343(r)(1); 21 C.F.R. § 101.65.

25. The Product's color would be significantly lighter if based solely on the ratio of refined white flour to whole grain graham flour.

26. According to expert W.K. Nip, the presence of "mostly reducing sugars in [honey's] sugar profile" causes it "[to] brown[s] easily during baking, adding a natural dark color to baked products such as bread, crackers, and other products."[5]

27. This small amount of honey contributes to consumers getting the misleading impression the Product contains more whole wheat graham flour than it does.

### IV. HONEY IS MISREPRESENTED AS MAIN SWEETENER

28. The representations convey that honey is the primary and/or a significant source of the sweetener ingredients used in the Product are misleading.

29. The Product is sweetened primarily with conventional sugars and contains a miniscule amount of honey.

#### A. Sugar Disfavored as Sweetener

30. In 2014, the National Institutes of Health cautioned, "experts agree that Americans eat and drink way too much sugar, and it's contributing to the obesity epidemic. Much of the sugar we eat isn't found naturally in food but is added during processing or preparation."[6]

31. The NIH noted further: "[s]everal studies have found a direct link between excess sugar consumption and obesity and cardiovascular problems worldwide."[7]

32. There has long been a consensus among doctors and nutritionists that "[e]ating too much sugar contributes to numerous health problems, including weight gain, Type 2 diabetes, dental caries, metabolic syndrome and heart disease, and even indirectly to cancer because of

---

[5] W.K. Nip et al., eds. *Bakery products: science and technology*, Ch. 7, "Sweeteners," John Wiley & Sons, 2006.
[6] NIH, Sweet Stuff: How Sugars and Sweeteners Affect Your Health, October 2014.
[7] *Id.*

6

certain cancers' relationship to obesity."[8]

33. In addition, "there is emerging research that suggests high-sugar diets may increase the risk of developing [dementia]."[9]

34. As part of a societal trend toward consuming healthier foods and natural foods, avoidance of added sugar has been and remains a significant consumer preference, with consumers strongly favoring honey as a sugar substitute.

35. At least in part due to growing consumer awareness of health problems caused by excessive sugar consumption, in recent years consumers have shown a distinct preference for products with little or no added sugar.

36. In August 2016, an article in "Prepared Foods" magazine noted that "[o]ngoing concerns about obesity and sugar intake have driven interest in reduced sugar and diet drinks in recent years."[10]

37. As another observer of the food industry explained in May 2017, "[h]ealth concerns and better educated consumers are propelling the demand for sugar reduction across food and beverage categories. . . Sugar reduction will be one of the top marketing claims prominently featured on products in the coming year…"[11]

38. Similarly, an article in the February 28, 2018, edition of "Food Business News" reported that "[s]peakers addressing consumer trends at the International Sweetener Colloquium in Orlando on February 13 said sugar avoidance was a macro trend 'that is here to stay and will

---

[8] Marlene Cimons, Eating too much sugar can hurt your health, and for some it's actually addictive, Washington Post December 16, 2017.
[9] Kieron Rooney, Yes, too much sugar is bad for our health – here's what the science says, The Conversation, March 8, 2018.
[10] PreparedFoods.com, Trends in Sugar Reduction and Natural Sweeteners, August 24, 2016.
[11] Laura Dembitzer, Less is More: Sugar Reduction, Less Sodium & Low-FODMAPS in Food, Beverage, Food Insider Journal, May 09, 2017.

only increase.'"[12]

39. The same article noted that "I.R.I. [Information Resources, Inc.] surveys show that 58% of consumers across generations are avoiding sugar. . . [and of] those avoiding sugar, 85% are doing so for health reasons and 58% for weight concerns."[13]

B. Consumer Preference for Products Sweetened with Honey Instead of Sugar

40. Surveys show "[c]onsumers rated honey at 73% 'better for you than sugar.'"[14]

41. A survey highlighted in "Prepared Foods" magazine in 2018 noted that: (i) "93% of consumers consider honey to be a natural sweetener;" (ii) "58% of consumers with one or more children look for honey on the product label;" (iii) "60% of consumers between the ages of 18 and 34 look for honey on the product label; and (iv) about half of consumers would pay at least 5% more for food bars, ready-to-drink tea, and yogurt primarily sweetened with honey."[15]

42. Referring to food products perceived as healthier, the Huffington Post reported that "[a]ccording to a 2015 Nielsen survey of 30,000 people, 90% of shoppers are willing to pay more for the added quality and benefits" these foods and ingredients provide.[16]

43. Honey fits all these criteria, as it is a naturally occurring substance and, unlike sugar, has small amounts of nutrients such as vitamins, minerals, enzymes, and antioxidants.

44. In addition, honey has a lower glycemic index than sugar, causing slower fluctuations in blood sugar and therefore in insulin levels.

45. Rapid spikes of blood sugar lead to quick spurts of energy followed by sharp declines characterized by tiredness, headaches, and difficulties in concentrating ("low blood sugar").

---

[12] Ron Sterk, Avoidance of sugar remains macro trend, Food Business News, February 28, 2018
[13] *Id.*
[14] *Id.*
[15] Supra, Trends in Sugar Reduction and Natural Sweeteners.
[16] Brian Kennell, Healthy Food Trends Drive New Products, HuffingtonPost.com, October 1, 2015, updated December 6, 2017.

46. Although sugar contains slightly fewer calories than honey by weight, honey is much sweeter than sugar and therefore less is needed to achieve the same level of sweetness.

47. Based on the common marketplace perception that honey is healthier and more natural than sugar, consumers place a greater value on products that are sweetened with honey instead of sugar and are willing to pay a higher price for such products.

C. Contrary to Representations, Honey is Present in De Minimis Amount and Product Is Sweetened Mainly with Sugar

48. The Product's ingredients, listed in descending order of predominance, reveal that "Sugar" is the predominant sweetening agent, followed by "Dried Cane Syrup," and finally, "Honey."

49. The Product has more vegetable oil than honey ingredients.

50. By comparing the sugar profile of the Product with the sugar profile of honey, the amount of honey can be estimated slightly above 2%.

D. The Product Contains Natural Flavor Which Imitates Honey, Causing Consumers to Expect a Greater Amount of Honey

51. Consumer preference is for foods which get their taste from food ingredients – like honey – instead of added "honey" flavor, because it is perceived as more natural and less processed than a flavor solution made by a chemist in a laboratory.

52. No less than 70% of consumers try to avoid all added flavors, because even "natural" flavors have been linked to detrimental health effects, containing additives, and made with environmentally harmful solvents.

53. All demographics of consumers would pay more for foods with no added flavors, which meant the food gets its taste from its food ingredients.

54. Unfortunately for consumers, what consumers may recognize as a "honey" taste is

not from honey, but from "Natural Flavor," listed in the ingredient list.

55. The front label fails to disclose the Product is "natural honey flavored," even though this statement is required under federal and state law.

56. The added natural flavor imitates honey, causing consumers to expect it has more honey than it does.

57. Consumers are misled to expect a non-negligible amount of honey because they see the honeybee, associated with honey, and the word "honey."

58. Instead, consumers do not receive enough honey because the natural flavor is needed to simulate the taste of honey.

59. Even if consumers view natural flavor on the ingredient list, they will not know this provides the Product's "honey" taste.

V.     **DEFENDANT'S REPRESENTATIONS MISLEAD CONSUMERS**

60. Federal and identical state regulations prohibit false and deceptive practices with respect to labeling food and beverages.

61. Product names can be misleading when they suggest one or more, but not all, of the key ingredients, like whole grain graham flour, yet fail to disclose other more predominant ingredients like refined flour. 21 C.F.R. § 101.18(b).

62. Whole grain graham flour and honey are characterizing ingredients because (1) their proportion has a material bearing on price and consumer acceptance of the Product and (2) the labeling creates an erroneous impression they are present in amounts greater than they are.

63. Crackers that have whole wheat graham flour as their predominant flour exist in the marketplace and are not technologically or otherwise unfeasible to produce.





64. When consumers see Defendant's Product and the above products, they will expect that the Trader Joe's item is equivalent in quality and nutrients, when it is of lesser quality.

65. Since Defendant's Product has an identical name to products that are of higher quality, consumers are misled.

## VI. CONCLUSION

66. The Product contains other representations which are misleading.

67. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

68. By labeling the Product in this manner, Defendant gained an advantage against other

11

companies, and against consumers seeking to purchase a product that contained a predominant amount of whole grain flour and honey relative to enriched flour and sugar.

69. The value of the Product that plaintiff purchased was materially less than its value as represented by defendant.

70. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

71. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

72. The Product is sold for a price premium compared to other similar products, no less than approximately $3.79 for 14.4 oz, a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

## Jurisdiction and Venue

73. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

74. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

75. Plaintiff Heather Swanberg is a citizen of Illinois.

76. Defendant Trader Joe's Company, is a California corporation with a principal place of business in Monrovia, Los Angeles County, California

77. Defendant transacts business within this District through sale of the Product at dozens of stores within this State and District, and online, sold directly to residents of this District.

78. Venue is in this District because plaintiff resides in this district and the actions giving rise to the claims occurred within this district.

79. Venue is in the Eastern Division in this District because a substantial part of the events or omissions giving rise to the claim occurred in Will County, i.e., Plaintiff's purchase of the Product and her awareness of the issues described here.

### Parties

80. Plaintiff Heather Swanberg is a citizen of Mokena, Will County, Illinois.

81. Defendant Trader Joe's Company, is a California corporation with a principal place of business in Monrovia, California, Los Angeles County.

82. Trader Joe's is an American chain of grocery stores with 530 stores nationwide.

83. Trader Joe's is the most profitable grocery store per square foot in the country.

84. Trader Joe's is a retailer that expresses its concern for the environment and labor practices.

85. In 2007, reacting to customer concerns, Trader Joe's began to eliminate foods imported from China.

86. Trader Joe's has been recognized by Greenpeace's CATO ("Carting Away the Oceans") program by removing unsustainable species of fish from its shelves.

87. Trader Joe's discontinues individual products based on customer reactions more often than larger grocery chains.

88. All these facts show a retailer with a significant amount of trust and equity when it comes to consumer purchasing.

89. While a typical grocery store may carry 50,000 items, Trader Joe's stocks about 4,000 items, 80% of which bear one of its brand names.

90. Trader Joe's sells regular groceries, but also gourmet foods, organic foods, vegetarian foods, unusual frozen foods, imported foods, and domestic and imported wine and beer.

91. While Trader Joe's stores sell leading national brands, they sell a large number of products under one of their private label brands, Trader Joe's.

92. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

93. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

94. Products under the Trader Joe's brand have an industry-wide reputation for quality and value.

95. In releasing products under the Trader Joe's brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

96. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

97. That Trader Joe's branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

98. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

99. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

100. Private label products under the Trader Joe's brand benefit by their association with consumers' appreciation for the Trader Joe's brand as a whole.

101. The development of private label items is a growth area for Trader Joe's, as they select only top suppliers to develop and produce Trader Joe's products.

102. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at Defendant's stores including locations at 14924 South La Grange Road, Orland Park, IL 60462, between May and July 2021, among other times.

103. Plaintiff bought the Product because she expected it contained a predominant amount of whole grain flour and honey relative to enriched flour and sugar because that is what the representations said and implied.

104. Plaintiff relied on the words and images on the Product, on the labeling and/or claims made by Defendant in digital and/or social media.

105. Plaintiff bought the Product at or exceeding the above-referenced price.

106. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

107. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes.

108. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

109. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's representations are consistent with its abilities and/or composition.

110. Plaintiff is unable to rely on the labeling of not only this Product, but other similar products, because she is unsure of whether their representations are truthful.

Class Allegations

111. Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged.
>
> **Consumer Fraud Multi-State Class**: All persons in the States of North Dakota, Texas, Iowa, Kansas, Georgia, Ohio, West Virginia, Virginia, North Carolina, Delaware, Montana, Kentucky, Tennessee, New Hampshire, Alaska, South Dakota, Oklahoma, Utah, Nebraska, Maine, and Wyoming, who purchased the Product during the statutes of limitations for each cause of action alleged

112. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

113. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

114. Plaintiff is an adequate representative because her interests do not conflict with other members.

115. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

116. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

117. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

118. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act<br>
("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

119. Plaintiff incorporates by reference all preceding paragraphs.

120. Plaintiff and class members desired to purchase a product that contained a predominant amount of whole grain flour and honey relative to enriched flour and sugar.

121. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

122. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

123. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

124. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

125. Plaintiff relied on the representations that the Product contained a predominant amount of whole grain flour and honey relative to enriched flour and sugar

126. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

127. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

128. Defendant intended that plaintiff and each of the other members of the Consumer

Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

129. As a result of defendant's use or employment of artifice, unfair or deceptive acts or business practices, plaintiff, and each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

130. In addition, defendant's conduct showed motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

131. The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it contained a predominant amount of whole grain flour and honey relative to enriched flour and sugar.

132. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

133. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted retailer known for its quality products.

134. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

135. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

136. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because it was not fit to pass in the trade as advertised.

137. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Negligent Misrepresentation

138. Defendant had a duty to truthfully represent the Product, which it breached.

139. This duty is based on defendant's position, holding itself out as having special knowledge and experience in this area, trusted retailer known for its quality products.

140. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant.

141. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

142. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

143. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained a predominant amount of whole grain flour and honey relative to enriched flour and sugar.

144. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and/or constructive knowledge of the falsity of the representations.

145. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

### Unjust Enrichment

146. Defendant obtained benefits and monies because the Product was not as represented

and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: December 4, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com